## McNEEL v. TEXAS & N. O. R. CO.

### No. 2261.

Court of Civil Appeals of Texas. Beaumont.

Nov. 16, 1932.

Rehearing Denied Nov. 30, 1932.

C. A. Lord and John D. McCall, both of Beaumont, for appellant.

F. J. & C. T. Duff and Lamar Cecil, all of Beaumont, for appellee.

O'QUINN, J.

Suit by Mrs. McNeel to recover $5,000 in her own right, and as next friend to recover for James McNeel, her minor son sixteen years of age, the sum of $10,000, damages alleged to have occurred by reason of the negligence of the appellee railroad. The several acts of alleged negligence were fully and adequately pleaded.

Appellee answered by general demurrer, general denial, and specially that the injuries of plaintiff James McNeel were the direct and sole result of his own negligent acts, fully setting forth the acts relied upon. Appellee also specially answered that appellant James McNeel was guilty of contributory negligence, which was the proximate cause of his injuries, specifically setting out the several matters asserted to constitute his contributory negligence.

The case was tried to a jury, but at the close of the evidence, the court, at the request of appellee, instructed the jury to return a verdict for defendant, appellee, which they did, and judgment was accordingly entered. Motion for a new trial was overruled, hence this appeal.

The facts show that appellee owned a railroad extending from the city of Beaumont to the town of Sabine, in Jefferson county, Tex., passing through the Spindletop oil fields some five miles south of the city of Beaumont. That said railroad had a switch track extending from its line of railway at a point about one mile north of the Spindletop oil fields eastward to the Magnolia refinery. That said switch track crossed a public road which extends from the city of Beaumont southward to the Spindletop oil fields, continuing in a southerly direction to the city of Port Arthur and the town of Sabine, and which public road is an extension of what is known as Highland avenue in the city of Beaumont. That Highland avenue is a paved road with smooth hard surface out as far as Spindletop oil fields, and from there on to Port Arthur is shelled. This road or highway is extensively used both day and night by automobiles, trucks, and other vehicles, and has been so used for many years. The road or highway crosses the switch track a few hundred yards north of the Spindletop oil fields almost at right angles—the highway at said crossing running practically north and south and the switch track east and west. The switch track was for the purpose of serving the oil fields, and usually operated but one train a day, that being at about 7:30 or 8 p. m. On September 13, 1930, at about 8 o'clock at night, the railroad servants were backing from the west a string of freight cars along the switch track eastward and across the public road crossing at a rate of about six miles per hour, and appellant James McNeel was riding with one W. L. Hargraves in an automobile which approached the crossing going south just about the time the first freight car was passing over the road crossing. Hargraves was driving his own car, a Whippet Four coupé with rumble seat. He and his two sons, and James McNeel, Wm. McNeel, and Edward Asbury—six of them—three in the front seat and three in the rumble seat, were going fishing to what is known as McFaddin Beach on the Gulf coast. James McNeel was riding in the rumble seat on the right side—the direction from which the train was approaching. Hargraves saw the freight cars on the crossing when he was seventy-five feet to one hundred feet from the crossing. He was driving forty miles per hour. His lights burning all right and his brakes operating all right. When he saw the freight cars on the crossing he put on his brakes and turned to the left—he was driving on the right side of the highway—east to avoid hitting the freight car, and ran off into a ditch, causing the injuries complained of. The highway consisted of paving in the center and gravel on the sides. The paved part was about eighteen feet in width. Hargraves testified that he was going forty miles an hour and that the freight cars were moving pretty slowly when he saw them. When asked if after the accident the locomotive bell was ringing he said that he did not hear it; that he was not listening for the bell; that he was not listening "for anything" be-

fore or after the accident. On cross-examination he was asked:

"Q. When you saw that car what did you do? A. I applied my brakes.

"Q. State whether or not they become effective and took hold when you applied them that day. A. They did, yes, sir.

"Q. What was your judgment as to whether you could bring your automobile to a stop and not strike that car, that box car? A. I did not know whether I could or not.

"Q. What was your judgment as to that, your best judgment on it? A. I do not think I could, I tried to.

"Q. As you approached there and saw the car, you applied your brakes, then what did you do with your car? A. I pulled to the left hand side of the road.

"Q. Why? A. So if the train did stop I might be able to go around the end of it.

"Q. And if it didn't stop, what? A. It didn't stop, so I took the ditch.

"Q. State whether the railroad train stopped or not. A. It did not.

"Q. Were you able to bring your car to a stop in the highway and not strike that car? A. No, sir.

"Q. What did you do with your automobile? A. I turned it in the ditch.

"Q. Where was the ditch, on which side of the highway? A. The one I turned into was on the left hand side.

"Q. What did your car strike when it went to the bottom of the ditch, if anything? A. It struck a culvert that goes under the railroad for drainage.

"Q. If you had not turned into the ditch, what would your car have done? A. It would have hit this railroad car.

"Q. Was there any way to avoid hitting it, except to take the ditch? A. No, sir.

"Q. State whether there was any light on the end of that train? A. No sir, I did not see any.

"Q. Was there a man on the back end of that car passing into the highway? A. No, sir.

"Q. State whether or not there was any person stationed there at the highway to pilot or guide that train across the highway? A. No, sir.

"Q. State whether or not there was any sparkler or anything of that kind on the end of that train. A. No, sir, there was no sparkler on it.

"Q. State whether or not there were any men on that train, and if there were, where were they? A. There were some men standing up in this car about probably half way of the car."

And again:

"Q. Now you said you thought if the train stopped you would run around the end of it, that's the reason you cut to the left? A. I did, yes, sir.

"Q. Why did you expect the train to stop? A. I thought maybe, when I first seen it, I thought maybe it was fixing to stop.

"Q. Why did you expect the train to stop when you were not going to stop? A. I did not expect them, I turned over in case they did stop I would go around.

"Q. In other words you could not stop but wanted the train to stop and if it did you would go around? A. In case I could not, I thought maybe if they stopped, I could go around."

And again:

"Q. So, after discovering the train 100 ft. away, you put on the brakes in emergency, you slid your wheels that distance, you got off the pavement and down into the ditch? A. I did not say I skidded 100 ft.

"Q. You put them in emergency from the beginning, didn't you? A. I never got hold of the emergency.

"Q. You were doing your best to stop, weren't you? A. Yes, sir."

In answer as to how fast he was running. he answered:

"We were running about 40 miles when we seen this train.

"Q. You continued at that speed until this train came into your vision? A. Yes, sir.

"Q. You think you were 75 or 100 ft. when you saw the train? A. Something like that, yes, sir.

"Q. Then you were going, well, were you looking for a train? A. No, sir.

"Q. Were you watching for a train? A. No, sir.

"Q. Did you look up to the west and east of you to see if a train was coming? A. I was looking straight down the highway.

"Q. Isn't it a fact you were not looking, were not paying any attention and not trying to see anything until it actually moved upon the road, isn't that a fact? A. No, I was looking down the highway and when it got on the highway I seen it.

"Q. There was nothing between you and that car to keep you from seeing it, if you had been looking, was there? A. If I had been looking at the tank I might have seen it, but I was looking down the highway."

In testifying as to how the train appeared to approach the crossing, and his seeing same, he was asked:

"Q. Well, if it didn't, what's your explanation you didn't see it as it moved from behind that tank? Your headlights were burn-

ing, you were 75 ft. away, your headlights would operate so it would illuminate the sides? A. That car was about the color of the highway.

"Q. But when the train moved out there and all that time, what kept you from seeing it? A. Well, it was just about the color of the highway, didn't show up much."

Appellant James McNeel testified that he was sixteen years old. That he was a guest riding with Hargraves going fishing. That the automobile was going at about forty miles an hour at the time it approached the crossing. That he was riding in the rumble seat on the right-hand side. That when the automobile was within 75 or 80 feet of the crossing he got a glimpse of the freight car backing onto the paved part of the highway. That he did not see the freight car until after Hargraves put on the brakes. That he saw neither a light nor any person on the end of the freight car backing onto the crossing. He said that he had been familiar with the crossing, driving over it for some three years, but that he had never before seen a train on the switch track. That he was on the side from which the train was coming. That if he had been looking he could have seen off to his right, but that he was not looking. That he knew the track was there and that there was a sign at the crossing reading: "Railroad Crossing Lookout for Cars." That he had nothing to do with the driving of the automobile and did not say anything about it to Hargraves. That he never thought anything about the railroad. That he did not consider it any of his business about how the car was driven. That the lead freight car had gotten all the way across and the second car had the crossing blocked when the train stopped. That he did not hear any whistle and that he did not listen for the whistle, and that if the whistle had been blown 80 rods from the crossing it would not have made any impression upon him. In answer to the question, "State whether or not you saw this freight train before the happening, before your car went off into the ditch," he answered: "Well, when he put on the brakes, well, I think I got a glance of the freight train backing up there somewheres around two or three ft. from the pavement." And when asked whether he saw it before or after the brakes went on, he said, "I seen it after the brakes went on." He further stated he had never seen any train on that switch track before.

As this judgment was upon an instructed verdict, we shall not quote any of the testimony of the appellee's servants in charge of the train, though much of it was without dispute.

The verdict was directed and the judgment entered upon the theory that appellant was guilty of contributory negligence as a matter of law. Appellants strongly insist that such is not the case, but that whether contributory negligence appears is a question of fact for the jury, and that it was error for the court to instruct the verdict.

Contributory negligence ordinarily is a question of fact for the jury. But when the evidence is such that but one reasonable conclusion can be drawn from it, then the question is one of law for the court. The undisputed evidence, as reflected above, shows that when the automobile in which McNeel was riding as the guest of Hargraves was within some 75 to 100 feet of the crossing, approaching same at right angles and traveling forty miles per hour, Hargraves discovered the freight car slowly backing upon the highway—at the edge of the paved center of the road. He makes no pretense that he had kept any sort of lookout for trains, but in fact admits that he did not do so, but was looking straight ahead down the highway, neither looking nor listening. Upon seeing the freight car on the crossing he put on his brakes, and, though he was on the right-hand side of the road, turned to his left. He did this, he says, because he thought the train might stop and he could run around the end of the train, but when the train did not stop, he, in order to avoid colliding with the freight car, continued to the left and ran into a ditch where his car turned over and the injuries were received. The train was moving very slowly, not more than six miles per hour. Hargraves said he ran about 75 or 100 feet while the train was going about 18 feet. Hargraves for years had been perfectly familiar with the highway and the switch track and the crossing. He admits he did not listen for a train—was not thinking about a train. He says: "No I was looking down the highway * * * and paying no attention to anything else, and when it got on the highway I seen it." It was a clear night and the auto headlights were burning brightly.

My associates say that under the holding in the Trochta Case (Tex. Com. App.) 218 S. W. 1038, and other decisions following same, we cannot say, under the evidence, that Hargraves, the driver of the automobile, was guilty as a matter of law of such negligence as would defeat him for a recovery for damages, if any, suffered by him, but that the question was one of fact for the jury. The writer cannot agree to this conclusion. It is my opinion that under the above-stated facts coming from the driver of the automobile and appellant McNeel themselves, all reasonable minds can arrive at but one conclusion, and that is that the driver of the automobile, Hargraves, was utterly lacking in the exercise of due care, in fact of any care, for his own safety and those with him in the automobile, and was,

therefore, guilty of such negligence as would, as a matter of law, defeat him in the recovery of any claim for damages he might assert in the premises. Texas Mexican R. Co. v. Hoy (Tex. Com. App.) 24 S.W.(2d) 18; Robinson v. Houston Belt & Terminal Ry. Co. (Tex. Civ. App.) 23 S.W.(2d) 894; Murphy v. Milheiser (Tex. Civ. App.) 30 S.W.(2d) 586 (writ refused); Missouri-Kansas-Texas R. Co. v. Cheek (Tex. Civ. App.) 18 S.W.(2d) 804 (writ dismissed).

The testimony of appellant McNeel showing that he exercised no care for his safety, and that he was perfectly familiar with the crossing, and was aware of the speed and manner in which the automobile was operated at the time and place, and that he acquiesced in same, we think agreed that whatever of negligence, under the circumstances, of which the driver of the automobile, Hargraves, was guilty, should be and is imputable to appellant James McNeel. Texas Mexican R. Co. v. Hoy (Tex. Com. App.) 24 S.W.(2d) 18, 20; Murphy v. Milheiser (Tex. Civ. App.) 30 S.W.(2d) 586 (writ refused). It being the opinion of the writer that Hargraves, the driver of the car, was guilty of contributory negligence as a matter of law, and that such negligence is imputable to appellant McNeel, the judgment should be affirmed.

In accordance with the views of my associates that the question of contributory negligence was one for the jury, and that the court erred in directing the verdict, the judgment will have to be reversed and the cause remanded, and it is so ordered.

Reversed and remanded.

## LAWHON, J.

In order that our reasons for reversing and remanding this case may be a little more fully stated, we will briefly summarize the evidence and apply the facts, as we understand them, to the only issue involved in this appeal.

■ As already stated in the opinion of Associate Justice O'QUINN, the switch track in question was used only one time each day. The driver of the automobile, Hargraves, and McNeel, one of the plaintiffs, both testified that although they had been over the crossing numerous times, they had never seen a train on this track before. The locomotive was backing and pulling a string of twenty-three freight cars in front of the locomotive and pushing two cars on the back from the west towards the crossing. The evidence raises the issue that there was no light on the end of the train as it entered the highway and no one was there to give signals or to pilot the train across the road. In fact, the evidence raises the issue that no signals or warning of any kind were given, so that persons using the highway would know that a train was preparing to cross. There was some evidence by the defendant that one man, or possibly two, were on the train with lighted lanterns, but, as the verdict was instructed, we must consider the evidence in its most favorable light from the standpoint of the injured party just before and at the time of the accident, rejecting all evidence favorable to the defendant. Barron v. Houston E. & W. T. R. Co. (Tex. Com. App.) 249 S. W. 825.

■■ The automobile in which McNeel, the injured party, was riding approached the crossing from the north and the driver saw the end of the train just about the time it reached the edge of the pavement. McNeel, the injured party, says it was within about 2 or 3 feet of the pavement. Both parties give the distance from the crossing at the time the train was seen at from 75 to 100 feet. The driver immediately applied his brakes and made every effort in his power, according to his testimony, to stop the automobile and avoid a collision with the train. He says, as we interpret his testimony, that he did not believe he could stop before the crossing was reached, but tried; he thought the train might stop before the freight car entirely crossed the pavement and in that event he thought he could go around the end of the train. The train did not stop so he ran into the ditch on the left-hand side of the highway in order to avoid a collision. He went to the left as he had no chance to get around the right end of the train on account of the long string of freight cars. He states that if he had not gone into the ditch he would have hit the train. The place of the accident was outside the city limits of Beaumont and forty miles an hour was not an unlawful rate of speed. The driver testified he was looking straight ahead and did not look to the right. The driver also testified that the car at the end of the train was about the same color as the pavement. As it was dark at the time, this fact would be an additional explanation as why he did not see the train sooner. It was a question of fact for the jury, under the evidence in this case, as to the distance from the crossing the driver and injured party should have commenced exercising some care to discover whether a train was about to cross the highway. Barron v. Houston E. & W. T. R. Co., supra, and cases therein cited.

It is now too well settled to admit of argument that it is not contributory negligence, as a matter of law, for a person to fail to stop, look, and listen before going upon a railroad track. It is contended that the driver of the automobile was guilty of negligence which contributed to the accident in failing to look to the west of the highway. He says he was watching the road ahead. It is our opinion that in keeping a close look-

out ahead, under the facts and circumstances of this case, his conduct was more in keeping with the conduct of a careful man than a careless man. In any event, we believe it was an issue for the jury. We think our conclusions are supported by the following authorities: Trochta v. M. K. & T. Ry. Co. (Com. App.) 218 S. W. 1038; Lancaster v. Browder (Tex. Com. App.) 256 S. W. 905; Freeman v. Galveston, H. & S. A. R. Co. (Tex. Com. App.) 285 S. W. 607; Barron v. Houston E. & W. T. R. Co., supra; and many other cases of like holding not necessary to cite.

The cases relied on to support the instructed verdict are not, in our opinion, in point as applied to the facts of this case. In Robinson v. Houston Belt & Terminal Ry. Co. (Tex. Civ. App.) 23 S.W.(2d) 894, the accident took place within the city limits of the city of Houston. The plaintiff, Robinson, ran his motorcycle into a moving train which was across the highway. We gather from the opinion that the track on which the train was moving was a main line track of the company. We should think it would be negligence for a person to run into a train blocking a paved street.

In the case of Texas Mex. Ry. Co. v. Hoy (Tex. Com. App.) 24 S.W.(2d) 18, it was held that it was contributory negligence, as a matter of law, to drive an automobile into a tank car which was standing on the main line of the railroad company blocking one of the principal thoroughfares of the city of Laredo. It was shown that the injured party was thoroughly familiar with the railroad crossing and knew that trains or cars might be using or occupying the same at any time of the day or night. These facts, we think, are materially different from the evidence in the case under consideration.

In Murphy v. Millheiser (Tex. Civ. App.) 30 S.W.(2d) 586, the injured party was riding in an automobile traveling eighty miles an hour on the highway between Galveston and Houston. This speed was maintained for about twenty-five or thirty miles before the car turned over. The injured party was suing the owner and driver of the car for his negligence in traveling at this excessive rate of speed. There was no question raised in this case that the speed was not the cause of the accident and, as the rate of speed was a violation of the law, it was negligence per se. The injured party was familiar with driving automobiles and knew that the car was being driven at eighty miles an hour and made no protest. The court there properly held that the negligence of the driver would be imputed to him and that he was guilty of negligence, as a matter of law, in not protesting.

In Missouri-Kansas-Texas R. Co. v. Cheek (Tex. Civ. App.) 18 S.W.(2d) 804, a man driving a team of young mules parallel to the highway, his wagon being loaded with hay, sued the railroad company for damages caused by one of its trains frightening the team and causing them to run away and overturn the wagon. The driver was on top of the load of hay and he was injured. The act of negligence was that the engineer caused an unusual and unnecessary emission of steam and noise, which was calculated to frighten the team driven by the plaintiff. On defensive issues of negligence on the part of the plaintiff the jury found that the plaintiff was guilty of negligence in driving a team and wagon upon the highway at the place in question and loaded in the manner it was loaded; that the plaintiff was guilty of negligence in failing to stop the team and get off the wagon when he discovered the train approaching; and that the negligence of the plaintiff in these respects caused or contributed to his injury. The jury found the railroad company guilty of negligence, and notwithstanding the findings that the plaintiff was guilty of contributory negligence, the trial court entered judgment against the defendant for $4,000. There was no statement of facts, but the case was appealed solely on the question that under the verdict of the jury judgment should have been rendered for the defendant. The Court of Civil Appeals necessarily sustained that contention.

The case of Texas & N. O. Ry. Co. v. Adams (Tex. Civ. App.) 27 S.W.(2d) 331, is relied upon by appellee in its brief to sustain the judgment herein appealed from. The opinion in that case was written by Associate Justice O'Quinn of this court. In that case the driver of an automobile ran into a locomotive while it was backing its engine and tender across a public road, preparing to make a coupling with freight cars standing on the west side of the crossing. The testimony showed that the headlight of the locomotive was burning and that several lights in the engine cab were also burning; that there was an electric red light with an electric wigwag at the crossing and fire was flashing from the oil pan of the engine. The plaintiff testified that he saw the lights of the engine when he was about 250 yards from the crossing and that he could have seen the locomotive on the crossing when he was at least 200 feet from the track. The headlights of his car were burning and there was nothing to keep him from seeing the locomotive at the crossing. He says that he did not actually see it until he was ten feet away. Even under this state of facts the majority of the court was of the opinion that the plaintiff was not guilty of contributory negligence as a matter of law, Judge O'Quinn being the only member of the court who thought the trial court should have instructed a verdict for the de-

fendant on that issue. The case was reversed and rendered because all members of the court were agreed that no actionable negligence on the part of the defendant was shown.

█ The plaintiff in the case under consideration alleged negligence on the part of the defendant railroad in failing to have a flagman on the end of the train and in moving the train into the highway without being able to observe that persons using the highway were approaching the crossing, and failing to have any light, fusee, or sparkler at the end of the train, and other acts of negligence, alleging that the defendant used no precaution to warn people using the highway that a train was about to cross. The evidence was sufficient to raise an issue as to one or more of these acts of negligence alleged, and that such negligence was the proximate cause of the injury.

Believing that the issue of contributory negligence was one for the jury, we, therefore, are of the opinion that the judgment of the trial court should be reversed, and the cause remanded for a new trial.